THE ÆTNA NATIONAL BANK vs. NELSON HOLLISTER.

Hartford Dist., Oct. T., 1886. PARK, C. J., CARPENTER, PARDEE, LOOMIS and GRANGER, Js.

The defendant gave a bond to the plaintiff bank to secure it against loss by reason of its dealings with a certain railroad company. The condition of the bond recited that the railroad company were "depositors of money in and customers of and dealers with said bank, and have made and are expected to make their checks and drafts upon the bank, and their account has been and is expected to be from time to time overdrawn, and said railroad company has been and may hereafter be indebted to said bank by reason of the payment by it of such drafts or overdrafts;" the obligors then agreeing, "in consideration of such dealing," that the railroad company should upon demand pay "any balance and interest which had been or should at any time be due from them to the bank; and in default thereof that the obligors would save the bank harmless from all loss by reason of such drafts or overdrafts and such indebtedness." Held that the operation of the bond was not limited to technical overdrafts but included any indebtedness of the railroad company growing out of the return to the bank of paper indorsed by the railroad company and which had been discounted by the bank and the proceeds drawn out by the railroad company.

The bond in express terms dispensed with diligence, notice, demand, or previous suit upon paper discounted for the railroad company, and

the guaranty was made a continuing one until withdrawn by a written notice to the bank. The bank had discounted for the railroad company two notes made and endorsed by certain parties for its accommodation. Held that the bank had not released the defendant from liability on the bond by its neglect to proceed against the makers and endorsers of the notes, although when the notes fell due and for a long time thereafter they were responsible.

The bond was dated in 1870. The railroad company became insolvent in 1876. The bank had soon after paid to the receiver of the company a small balance standing at the time to the credit of the company. Held that this did not bar the bank of its right of recovery upon the bond.

The bank had also taken a small real estate security from the maker of one of the notes when at the time he had three or four thousand dollars worth of other real estate. Held not to defeat its right of recovery.

The bank had delayed finally revising its account against the railroad company until 1883, when by charging back the unpaid notes which it held it created a large balance on its books against the railroad company. It then, for the first time, notified the defendant of his liability for the notes on the bond and of its purpose to hold him liable. Held in view of the provisions of the bond that this did not constitute a legal defense.

It not appearing that the defendant was misled to his prejudice by anything done or omitted on the part of the bank, a necessary element of an estoppel was wanting.

The defendant was described in the bond as treasurer of the railroad company, and signed it with the word "treasurer" affixed to his name. The court below found that there was no evidence that the defendant had any power to bind the company, and then added "I find that he had no such power." Held that it was not to be inferred that the court *found the want of power merely from the absence of evidence that he had it,* as there might have been no evidence to show affirmatively such power, while at the same time there might have been much evidence to negative its existence.

[Argued November 11th—decided December 29th, 1886.]

ACTION against the defendant as one of the obligors upon a bond; brought to the Superior Court in Hartford County, and heard before *Beardsley, J.* The bond was as follows:—

" Know all men by these presents that we, James C. Walkley of Hartford, in the state of Connecticut, and Nelson Hollister of said Hartford, Treasurer of the Connecticut Valley Railroad Company, are holden and firmly bound jointly and severally unto the Ætna National Bank of Hartford in the penal sum of forty thousand dollars, to be paid to them or their certain attorney, successors or assigns.

To the which payment well and truly to be made and done, the said obligors do jointly and severally bind themselves, their heirs, executors and administrators, and each and every of them, for and in the whole, firmly by these presents. Signed with our hands, and sealed with our seals, at Hartford, this 11th day of July, A. D. 1870. The condition of this obligation is such that, whereas the Connecticut Valley Railroad Company are depositors of money in, and customers and dealers with said Ætna Bank, and have made and are expected to make their checks and drafts by their treasurer or otherwise upon said bank, and their account has been and is expected to and may be at some time or times or from time to time overdrawn, and said railroad company has and may hereafter become and be indebted to said bank by reason of the payment by said bank of such drafts or overdrafts; and whereas the obligors herein have heretofore agreed and do hereby undertake and agree to and with said bank, and in consideration of the premises and such dealing, that said railroad company shall and will, upon demand, pay and make good any balance and interest which has or shall at any time or from time to time become and be due from them to said bank, and in default thereof that they the said obligors will, upon demand, pay and satisfy the same and indemnify and save said bank harmless from and against all loss, cost and damage by reason of any such drafts or overdrafts and such indebtedness, without any notice of any kind of such drafts or overdrafts or indebtedness being required or previously given to said obligors by said bank or suit instituted against said railroad company; it being understood and agreed that the aforesaid undertaking and agreement on the part of said obligors shall be a continuing guaranty to said bank until the same is withdrawn or recalled by a written notice to said bank, and that no notice of any kind need be given or suit brought for the purpose of fixing the liability of said obligors or any of the parties, to said bank: Now if said obligors shall and do well and truly abide by and perform their said agreement, promise and undertaking, and on demand pay and satisfy any and

Ætna Bank *v.* Hollister.

all such balance or balances and indebtedness and indemnify and save said bank harmless from and against all loss, cost, and damages, by reason of any such draft, drafts, overdrafts and indebtedness of said railroad company to said bank, then the above and foregoing obligation shall be void, otherwise in full force and virtue.

N. HOLLISTER, TREAS., [SEAL.]
JAMES C. WALKLEY, [SEAL.] "

The complaint set out the foregoing bond and alleged that the Connecticut Valley Railroad Company, after the execution and delivery of the bond, made its checks and drafts upon the plaintiff bank, and that its account became and remained overdrawn, and that the company became and still was indebted to the plaintiff bank by reason of the payment by the bank of such checks and drafts, and that the railroad company did not pay the balance which became due to the bank and had never paid the same; and that neither the defendant nor said Walkley had ever paid the same, nor had ever indemnified and saved harmless the plaintiff bank from loss, cost and damage by reason of such overdrafts and indebtedness of the railroad company; demanding ten thousand dollars damages.

The defendant filed four defenses, the last of which was as follows:

" This defendant avers that in or about the year 1875 he ceased to act as treasurer of said railroad company; that in November, 1876, the account between said company and the plaintiff was settled and balanced, and so remained settled and balanced on the books of the plaintiff until April, 1883, a period of nearly seven years; that the present claim in favor of the plaintiff against said railroad company, and for which it seeks to hold the defendant liable in this suit, is as follows:—On or about the first of November, 1875, the plaintiff discounted two notes, for the sum of $4,500 each, each payable to the Connecticut Valley Railroad Company at the plaintiff's bank, both dated November 1st, 1875, one payable three months after date, and signed by Isaac Arnold, and the other payable four months after date and signed by

Oliver H. Clark; that each of said notes was endorsed and guaranteed not only by said Connecticut Valley Railroad Company, but by J. C. Walkley and the Charter Oak Life Insurance Company; that at the time said two notes fell due, both of the makers thereof and the said J. C. Walkley and the said Charter Oak Life Insurance Company were fully able to pay the same, and were possessed of visible property open to attachment, whereby said notes could have been, by due diligence, secured and collected; that said bank took no measures to collect said notes until about the year 1883, when the said Arnold and Clark and the said Walkley had all become insolvent, and therefore more than six years after said notes fell due, and after the plaintiff had failed to collect the same through its own laches. Said bank charged over the balance due on said notes to said railroad company, and now seeks to hold this defendant liable for the same."

To this defense the plaintiff demurred, but the court overruled the demurrer.

The court made the following finding of facts upon the issues of fact in the case.

At the time the bond in question was executed the Connecticut Valley Railroad Company was a customer and dealer with the plaintiff bank, and kept an account on its books in which credits were given from time to time for deposits, proceeds of discounts, etc., against which the company from time to time drew checks, drafts, etc., which were charged on the account, and so continued until about the 23d of November, 1876.

On June 29th, 1875, James C. Walkley, who was the president of the Charter Oak Life Insurance Company, and also of the Connecticut Valley Railroad Company, presented to the plaintiff for discount two notes, one signed by Isaac Arnold, payable four months after date, to the order of the Connecticut Valley Railroad Company, for the sum of $5,000, and the other signed by Oliver H. Clark, payable in the same way, for $5,000, each of which notes was endorsed as follows:—

" CHARTER OAK LIFE INSURANCE CO.,
    By J. C. WALKLEY, *President.*

" J. C. WALKLEY.

" THE CONNECTICUT VALLEY RAILROAD COMPANY,
    By J. C. WALKLEY, *President.*"

Mr. Walkley represented that the Charter Oak Life Insurance Company was the holder of all the second mortgage bonds of the railroad, amounting to $1,250,000, and also a large holder of the first mortgage bonds, and that it was important to maintain the credit of the company by paying the coupons on the first mortgage bonds as they fell due, and that the insurance company, owing to embarrassments, was unable to advance the money to pay the coupons, as it had been accustomed to do.

The bank discounted the notes, and by the direction of Mr. Walkley placed the avails to the credit of the railroad company, amounting to $9,726.67, and Mr. Walkley, as president of the company, immediately drew his check in favor of the Connecticut River Bank for $8,000, to be used in paying such coupons as were payable at the last named bank. This check was duly paid by the plaintiff.

On the 29th of June, 1875, before the discounts were made, the railroad company had overdrawn its account with the plaintiff to the amount of $5,086.37. On November 1st, 1875, when the notes became due, the railroad company, by Walkley as president, presented renewal notes of Arnold and Clark, each for the sum of $4,500, and dated November 1st, 1874, one signed by Clark, payable four months after date, to the order of the Connecticut Valley Railroad Company, at the plaintiff's bank, the other signed by Arnold, payable three months after date, to the order of the Connecticut Valley Railroad Company at the plaintiff's bank. Each of the notes was endorsed in the same manner as the original notes.

On the same day, November 1st, 1875, the railroad company, by Walkley, its president, presented these two notes to the plaintiff for discount. The plaintiff discounted them and placed the proceeds to the credit of the railroad com-

pany, and the railroad company, thereupon, by its president, drew its check upon the plaintiff for the sum of $10,000, and took up the first two notes of $5,000 each.

When Clark and Arnold executed the notes of $5,000 and $4,500 each, they were both accommodation makers, and executed the notes at the request of Walkley, who at the time gave to each a guaranty that the notes should be paid and Arnold and Clark saved harmless therefrom. The guaranty given to Clark was signed as follows:—

"THE CHARTER OAK LIFE INSURANCE CO.,
             By J. C. WALKLEY, *President.*

"J. C. WALKLEY,

"THE CONNECTICUT VALLEY RAILROAD COMPANY,
             By J. C. WALKLEY, *President.*"

The guaranty given to Arnold was signed by the Charter Oak Life Insurance Company and by J. C. Walkley only.

The plaintiff had no knowledge that the notes or either of them were accommodation notes, until some time after the last of the notes fell due, but discounted the same supposing them to be business paper given for value. The defendant Hollister had no knowledge of the execution or discount of the notes until after the same fell due, and ceased to be the treasurer of the railroad company in November, 1875. When the two last notes became due they were not paid by their makers, Arnold and Clark. The endorsers were duly notified, and the Connecticut Valley Railroad Company became and was liable as endorser upon both of the notes.

When the last two notes of $4,500 each fell due, Arnold, Clark and Walkley were each the owners of sufficient real and personal estate, standing in their names, free of incumbrance, to enable the bank to secure the payment of the notes by attachment, and so continued for several months thereafter.

The bank took no legal steps to enforce the collection of the notes until the 19th of March, 1877, when it took from Arnold a mortgage of certain real estate, valued at about $500, although he then had other unincumbered real estate

of the value of from $3,500 to $4,000, and on the 8th day of May, 1877, commenced suit against Clark, on the note given by him, but were unable to obtain any security. Arnold, Clark and Walkley soon after this became insolvent, and have so continued ever since.

In June, 1876, the railroad company passed into the hands of the second mortgage bondholders, and has ever since been and still is utterly insolvent.

On the 23d of November, 1876, the plaintiff's bank closed and balanced the account of the railroad company upon the books of the bank, which showed a balance due to the company of $6.24. This balance on that day was paid over to the representatives of the railroad company.

The Charter Oak Life Insurance Company refused to pay the notes signed by Arnold and Clark, and afterwards, on the 18th of October, 1879, the plaintiff commenced suit against it to enforce the payment of the two notes. In this suit the plaintiff was unsuccessful in its attempt to hold the insurance company liable upon the two notes.

On the 13th of April, 1883, the plaintiff's bank opened a new account with the railroad company, on the books of the bank, charging to the company the amount then due on the two notes given by Arnold and Clark, amounting to $9,792.67. There had been no account on the books of the bank with the company, since the 23d of November, 1876, down to the time of the entry of April 13th, 1883. The charging of the two notes of Arnold and Clark on the books of the bank to the railroad company was without the knowledge or consent of the company, and there had been no course of dealings between the company and the bank which authorized such charge to be made.

The bank first gave notice to the defendant that it should hold him liable under the bond for the payment of the sums due on the notes, in April, 1883.

The railroad company, in July, 1870, was engaged in building its railroad, and was a customer of the plaintiff. It desired to obtain accommodations in order to meet its current obligations, and especially a check for $40,000 drawn

to the order of one of its contractors. Walkley, as president of the company, applied to the plaintiff for such accommodation, and upon its declining to furnish it upon the credit of the railroad company, proposed to give a bond by the defendant and himself as security for such accommodation; and the president of the bank drew the bond now in suit and handed it to Walkley with the seals affixed. Walkley thereupon presented it in the office of the company to the defendant, and requested him to sign it as treasurer, and the defendant thereupon signed it, adding to his name the word "treasurer."

The draftsman of the bond added the words "Treasurer of the Connecticut Valley Railroad Company" to the name and residence of the defendant in the bond, as descriptive merely of the person who was to sign it. There was no evidence that the defendant had any power, by his signature as treasurer or otherwise, to bind the company by an instrument of this description, and I find that he had no such power. It did not appear whether the railroad company had any special seal.

The plaintiff claimed as law—1. That the balance thus created came within the terms of the bond, and that it was entitled to recover the amount thereof.—2. That inasmuch as the bond was to indemnify and save the bank harmless from any draft or overdraft, made by the railroad company upon the bank, the defendant was liable for the amount of such drafts drawn against the credits procured by the discount of the notes, the notes not having been paid.—3. That there was an overdraft to the amount of $9,792.62, which was only offset by a fictitious credit to a like amount on account of the notes, and that so long as the notes remained unpaid, although credited to the railroad company, they could not be treated as a payment of the overdraft.—4. That the notes, being payable at the plaintiff bank, are themselves, under the circumstances, a draft upon the bank, and thus are overdrafts to the amount thereof with interest. 5. That by the general usage and custom of banks, of which the court would take judicial notice, the plaintiff had

a legal right to charge up the notes against the railroad company, and thus create a balance upon its books against the company.—6. That the indebtedness of the railroad company to the plaintiff upon the notes was an indebtedness covered by the bond.—7. That from the facts admitted and proved the plaintiff was entitled to judgment for $9,792.62 and interest.

All these claims of the plaintiff the court overruled, and rendered judgment for the defendant. The plaintiff appealed.

*H. Willey* and *C. J. Cole*, for the appellant.

1. The court erred in holding that the plaintiff had been guilty of laches that would discharge the surety; for before the surety can claim that he is damaged by the laches of the holder of an obligation, he must at least show that he has requested him to pursue his remedy against other parties, as in the case of *King* v. *Baldwin*, 17 Johns., 384, and he must have given notice also of the termination of his guaranty named in the bond. The rule laid down in that case is doubted, and the law now seems to be this : If, after the debt is due, the surety request the creditor to sue the principal, who is then solvent, and the creditor fails to do so, and the principal afterwards becomes insolvent, the surety is not thereby discharged. The ground upon which these decisions rest is, that the principal and surety are both equally bound to the creditor, who may have taken a surety in order that he may not have to sue the principal. *Hunt* v. *Bridgham*, 2 Pick., 581; *Bellows* v. *Lovell*, 5 id., 307; *Boardman* v. *Larrabee*, 51 Conn., 39; 2 Hare & Wall. Am. Leading Cases, 388, and cases cited; Brandt on Suretyship, p. 208, and cases cited. Moreover the bond itself provides that it shall be a continuing guaranty until terminated by written notice, and that neither notice nor suit shall be required to charge the surety. The holder of a note is not bound, if sufficient personal property of the maker cannot be found, to attach real estate in order to hold liable a guarantor of its collectibility. *Allen* v. *Rundle*, 50 Conn.,

588. The giving of the notes of Arnold and Clark for the accommodation of and endorsed by the railroad company, and credit given to the company for the notes, against which it drew its drafts, does not discharge the indebtedness of the railroad company for the money obtained by them on such drafts, such notes not being paid. The giving of notes for overdrafts or indebtedness as in this case, and they not being paid, suit can be maintained against the railroad company for their amount, and equally so against the obligors in the bond, the notes not having operated as payment of such overdrafts or indebtedness. *Dougal* v. *Cowles*, 5 Day, 511; *Davidson* v. *Borough of Bridgeport*, 8 Conn., 472; *Bill* v. *Porter*, 9 id., 23; *Fairchild* v. *Holly*, 10 id., 478; *Freeman* v. *Benedict*, 37 id., 559; *Merrill* v. *Kenyon*, 48 id., 320. The court has found the bond to be the individual bond of the defendant and that he had no authority to bind the railroad company by it.

2. The court erred in overruling the claims of the plaintiff as to the law. The bond recites:—1. That the railroad company are depositors of money in and are customers of and dealers with the Ætna Bank.—2. That they have made and are expected to make their checks and drafts upon the bank.—3. That their account has been, and is expected to be, from time to time overdrawn.—4. That the railroad company may be indebted to the bank by reason of the payment by the bank of such drafts or overdrafts. What is involved in these various recitals? The first recital embraces all that the relation of customers and dealers with a bank implies—not merely the deposit of money on one side and payment of checks on the other, but all the transactions between the railroad company as its customers and the bank. The second recital implies that the company will make their checks and drafts upon the bank, against the credits thus given the railroad company, and the bank will pay such checks and drafts before the paper for which credit is given the railroad company becomes due or is paid. The third recital implies that the railroad company may at times have exhausted their credit, and have

nothing in bank against which to draw, and yet overdraw their account from time to time, when they have nothing to their credit, and that the bank will pay these checks. The fourth recital implies that, growing out of this relation between the railroad company and the bank, the company will become indebted to the bank and a balance become due from the railroad company to the bank, which was intended to be provided for by the bond. In view of this relation, what has this bond provided against and the bondsmen undertaken to do? They have agreed with the bank, in consideration of the premises and such dealing, that the railroad company shall on demand pay and make good any balance and interest which shall at any time or from time to time become and be due from them to the bank by reason of such dealing, and in default thereof that they, the bondsmen, will pay and satisfy the same. It would seem that this was broad enough to cover every balance or liability growing out of the banking business. But this is not all. They agree to save the bank harmless from all loss, cost and damage, by reason of any such draft or overdraft, or any such indebtedness; and that "no notice of any kind need be given, or suit brought, for the purpose of fixing the liability of the obligors, or of any of the parties, to the bank;" that "no notice of any kind of such overdraft, or drafts, or indebtedness, need be given to the bondsmen by the bank, or suit instituted against the railroad company," the obligation being a "continuing guaranty to said bank until the same is withdrawn or canceled by a written notice to said bank." The finding shows that on the 29th of June, 1875, when the first notes of $5,000 each were discounted, and the avails placed to the credit of the railroad company, amounting to $9,726.67, Mr. Walkley, as president of the company, immediately drew his check in favor of the Connecticut River Bank for $8,000, to be used in paying coupons of the first mortgage bonds of the railroad company, which check was duly paid by the bank; that at this time, before the discounts were made, the railroad company had overdrawn its account to the amount of

$5,086.37 ; that on the 1st of November, 1875, the railroad company, by its president, presented two notes of Arnold and Clark, each for $4,500, which were renewal notes of the above-named $5,000 notes, which were discounted and the proceeds placed to the credit of the railroad company, and the company thereupon drew its check for $10,000 and took up the first-named $5,000 notes. These last notes of $4,500 each have never been paid, and a balance with interest of $9,792.67 was due April 1st, 1883. Is not this a balance or an indebtedness against the railroad company which the bond covers? Unless this balance is paid the bank has suffered and will suffer damage by reason of the overdraft of $5,086.37, and by reason of the draft of $8,000, and by the subsequent draft of $10,000, to the amount we claim. It is this loss and damage that the defendant in his bond undertook to indemnify the bank against. By the general usage of banks the plaintiff had a legal right to charge up these notes against the railroad company, and thus create a balance upon its books against the company. Courts take judicial notice of the universal practice of banks. *Merchants' Bank* v. *Hall*, 83 N. York, 338. It is the duty of the bank to pay its customers' checks when in funds, at least it has authority, if it is not actually under obligation, to pay their bills, notes and acceptances drawn on, or made payable or negotiable at the bank; and these bills and notes are their orders to pay equally with their checks. Morse on Banking, 37, and cases cited. If the banker at whose counter the bill or note of his customer is made payable, has not at the time for payment sufficient amount for this purpose to the credit of the customer, but if, nevertheless, he pays the bill or note, making up the deficiency from his own funds, he will be entitled afterwards to recover the amount so advanced by him as money loaned to or paid for the use of the customer. Id., 38. If it is claimed that the notes of Arnold and Clark were not in fact the notes of the railroad company, and were not discounted for the company in such manner that they became its drafts on the bank, but that the company was merely an indorser, then the notes

were improperly credited to the railroad company; and if we strike out the improper credit, there would be due to the Ætna Bank on account of the overdrafts of the company just the amount of these notes. If, however, the notes were for the benefit of the railroad company, and were discounted for and placed to the credit of the company, then they were, in contemplation of law, the drafts of the railroad company on the bank. *Ætna Nat. Bank* v. *Fourth Nat. Bank*, 46 N. York, 82, 88; *Mandeville* v. *Union Bank of Georgetown*, 9 Cranch, 9; *Union Bank* v. *Tutt*, 5 Mo. App., 342; *Muench* v. *Valley Bank*, 11 id., 144; *Home Nat. Bank* v. *Newton*, 8 Bradwell, 565; *Edgerton* v. *Fulton Bank*, 43 How. Pr. R., 216; *Kymer* v. *Laurie*, 18 L. J., Com. Law, 218; *Jourdaine* v. *Lefevre*, 1 Esp., 66.

*A. P. Hyde*, for the appellee.

1. The court erred in not holding, on the facts found, that the bond was not the personal bond of the defendant. If this be so the evidence on the other points becomes immaterial, as judgment in any event should have been given for the defendant. That the defendant was not personally liable on the bond follows necessarily from the proper construction of its language. It begins: "We, James C. Walkley, of Hartford, and Nelson Hollister, Treasurer of the Connecticut Valley Railroad Company, are holden." And it is signed "N. Hollister, Treas.," and "James C. Walkley." These are as apt words to describe the railroad company as a party to the bond as though it had read "Nelson Hollister as treasurer." That the treasurer, in the bond, represented the company further appears from the condition, which recites that "whereas the Connecticut Valley Railroad Company are depositors of money in and customers and dealers with said Ætna Bank, and have and are expected to make their checks and drafts by their treasurer, or otherwise, upon said bank." The question is one simply of construction, in which we claim the court erred, if we look simply to the language of the bond itself. But if we look to the extrinsic facts found by the court which can

throw any light on the intent of the signers of the bond, the case is still stronger for the defendant. It is true the court finds that "the draftsman of the bond added the words 'Treasurer of the Connecticut Valley Railroad Company,' as descriptive merely of the person who was to sign it." But the question is not what the draftsman intended, but whether the person who executed the bond intended to bind himself or the railroad company. It should also be remembered that the "draftsman of the bond" was the president of the plaintiff bank, and was himself a most astute lawyer. If there be any doubt or ambiguity as to the construction of the bond, it must be resolved against the plaintiff and not against the defendant. Courts of justice will not, unless compelled, give such a construction as would have the effect of entrapping the signer into assuming a liability he never intended or anticipated. Walkley was the president of the railroad company. The defendant was treasurer. Why one should be described in the bond without any title of office and the other with, would puzzle a layman to understand, unless it was that Walkley was contracting as an individual and the company by Hollister as treasurer. The construction we claim is fully sustained by the decisions of our own court. *Shelton* v. *Darling*, 2 Conn., 435; *Hovey* v. *Magill*, id., 680; *Magill* v. *Hinsdale*, 6 id., 468; *Stamford Bank* v. *Ferris*, 17 id., 259; *Johnson* v. *Smith*, 21 id., 627. If there be any doubt as to the meaning of the language used in such a case, the circumstances are admissible, and it is proper to prove by parol the true intent. In *Stamford Bank* v. *Ferris*, cited above, the court say (p. 272): "In view of the principles before alluded to we are at a loss to know how it can be said that, as a matter of legal inference, the stock in question became the legal estate of Edward Hill. We think the legal presumption is the other way. But if there had been any doubt on this subject it might have been made certain by parol proof. In *Wilson* v. *Hart*, 7 Taunt., 295, PARKE, J., says it is the constant course to show, by parol evidence, whether a contracting party was agent or principal." In *Pease* v. *Pease,*

35 Conn., 131, the question was whether certain notes and guaranties, signed " Zelotes Terry " and " Zelotes Terry, Trustee," might be shown by extrinsic evidence to be the notes and guaranties of the community of Shakers. It was held that such evidence was admissible. See also *Metcalf* v. *Williams*, 104 U. S. R., 97. The extrinsic evidence found by the court is substantially as follows : " The bond as drawn was handed to Walkley with the seals affixed. Walkley thereupon presented it in the office of the company, to the defendant, and requested him to sign it as treasurer, and the defendant thereupon signed it, adding to his name the word ' Treasurer.' " This embraces all the evidence bearing upon the question of the intent of the defendant, and we submit that it conclusively shows that the defendant signed, not individually, but as treasurer. But it may be said that the court finds that " there was no evidence that the defendant had any power, by his signature as treasurer or otherwise, to bind the company by an instrument of this description, and I find that he had no such power." As to the finding that he had no such power, it is declared to be made without any evidence, and therefore this finding is nugatory as a fact. The case simply stands on the finding that there was no evidence on this point. To this we say —no question was raised by the pleadings as to the power of the treasurer to bind the company, and so no evidence was offered by either party on that question, as it was not in issue. The absence of evidence uncalled for is no proof that none exists. The only question before the court was, did the defendant sign the bond individually or as representing the company? If he signed as representing the company, and his authority so to do should be disputed and put in issue and not proved, still the defendant would not be liable as a contracting party, though he might be liable in a proper action for assuming an authority he did not possess. 1 Parsons on Cont. (6th ed.) 68; *Ogden* v. *Raymond*, 22 Conn., 385. Again, on the point of authority, the obligation so far as the company is concerned is simply to repay money advanced or loaned to it by the bank, and

such an obligation can be incurred by the treasurer of a private corporation without express authority. It is within the scope of his general authority. If the corporation has had the money and it has gone or been devoted properly to its use, general assumpsit will lie for its recovery. Any financial officer in promising to repay is simply making the promise which the law implies. Such a promise may be by note or bond. The fact that the contract is a specialty does not weaken the obligation. But it is claimed that the seal is not the special seal of the corporation, but the individual seal of the defendant. The seal is affixed to the signature "Nelson Hollister, Treasurer." Whose seal is it? The presumption is that it is the seal of the party signing. *Mill Dam Foundry* v. *Hovey*, 21 Pick., 428. The claim, however, is that the signature must be that of Nelson Hollister individually, because the seal is not a special corporate seal. But the court finds that "it did not appear whether the railroad company had any special seal." There being no evidence that the corporation had a special seal, it is the same as if it had none. The argument of the plaintiffs is then in a circle and fails to have any force. *Magill* v. *Hinsdale*, 6 Conn., 464; *Savings Bank* v. *Davis*, 8 id., 191. If the corporation had no special seal, it certainly could adopt any seal.

2. But even if the court shall hold that the bond was that of the defendant, yet we say the debt sought to be recovered in this suit is not such a claim as was contemplated or covered by the bond. The purpose of giving the bond, and the liability to the bank which it was intended to secure, are fully described in the first clause of the condition of the bond as follows :—" Whereas the Connecticut Valley Railroad Company are depositors of money in, and customers and dealers with, said Ætna Bank, and have made and are expected to make their checks and drafts by their treasurer or otherwise upon said bank, and their account has been, and is expected to, and may be at some time or times, or from time to time, overdrawn, and said railroad company has and may hereafter become and be indebted to

said bank by reason of the payment by said bank of such drafts or overdrafts." This clause describes the liability intended to be secured, and the way and manner in which it was expected it might accrue. It was only this, that it was anticipated that the bank might pay checks or drafts drawn upon the bank without funds being in hand to meet them, and charge such checks or overdrafts to the railroad company in their account, whereby their account, from time to time, might become overdrawn. No other liability was contemplated except such as might be expected to accrue in the manner above specified. That this kind of indebtedness only was contemplated is evident from the following clauses in the condition of the bond. The very next clause recites that the obligors have agreed " that the said railroad company shall and will, upon demand, pay and make good any balance and interest which has or shall at any time, or from time to time, become and be due from them to said bank." What balance and interest is here referred to? Clearly the balance and interest on the account which it was anticipated might accrue, as before stated. So the next clause recites that the " said obligors will, upon demand, pay and satisfy the same and indemnify and save said bank harmless from all loss, cost and damage by reason of any such drafts or overdrafts and such indebtedness." This unmistakably refers to the kind of indebtedness specified in the first clause of the condition. So in the final clause of the bond it is provided that, if said obligors shall perform their said agreement, " and on demand pay and satisfy any and all such balance or balances and indebtedness and indemnify and save said bank harmless from all loss, cost and damages by reason of such draft, drafts, overdrafts and indebtedness of said railroad company to said bank," then the obligation to be void. This clearly refers to the indebtedness to be created on account, and in the manner specified in the first clause of the bond. It was not intended to secure the bank for any indebtedness which might accrue to them, except in the manner above specified, to wit—the balance of account which might accrue by

reason of the bank paying checks or drafts of the company on the bank, which would properly be chargeable on account. If the bank should see fit to purchase bonds of the railroad company, on which the company might subsequently become in default, this bond clearly was not intended to secure such an indebtedness. And if the bank should see fit to purchase or discount the notes of third persons, endorsed by the railroad company, such notes did not constitute such a liability as was contemplated by this bond. They would be neither checks, drafts nor overdrafts to be charged on account. This bond was a contract of guaranty, and the liability of the obligors is not to be extended by implication or construction beyond the fair import of the language of the bond. It has been often held that a contract of guaranty was to be construed strictly in favor of the guarantor, and all the authorities agree that the guarantor is not bound beyond the fair import of the actual terms of his engagement. 2 Parsons on Cont., (6th ed.,) 5, 15; *Miller* v. *Stewart*, 9 Wheat., 680; *Douglas* v. *Reynolds*, 7 Peters, 113; Fell's Law of Guaranty, (3d Am. ed.,) 115. This doctrine is the same as that adopted by our court in the case of *Hotchkiss* v. *Barnes*, 34 Conn., 27. In this case the only claims held by the bank, and which they seek to recover, are the two notes given by the third parties and endorsed by the railroad company and others. It is found by the court that "the indorsers were duly notified, and said Connecticut Valley Railroad Company became and was liable as indorser upon both of said notes." The liability of the railroad company was only as indorser, a special and contingent contract, and the bank could only recover against the railroad company by a special suit on the indorsement. Such a claim is not properly a claim on account against the railroad company, and it certainly did not accrue by reason of any checks or drafts of the railroad company, by their treasurer or otherwise, upon the bank, as specified in the bond. This construction of the bond is also that which the bank itself recognized at the time. When the notes fell due and the

indorsers were notified they made no charge to the railroad company on their account. Afterwards, "in June, 1876, the railroad company passed into the hands of the second mortgage bondholders, and has ever since been and still is utterly insolvent," and "on the 23d day of November, 1876, the plaintiff's bank closed and balanced the account of the railroad company upon its books, which showed a balance due to the company of $6.24. This balance was paid over to the representatives of the railroad company." It is clear that, at that time, the bank did not regard these notes as an overdraft or proper charge against the railroad company in their account. On the other hand, it is found that, on the 19th of March, 1877, "said bank took from said Arnold (the maker of one of the notes) a mortgage of certain real estate, valued at about $500 " (which we suppose they still retain), " although he then had other unincumbered real estate of the value of from $3,500 to $4,000, and on the 8th day of May, 1877, commenced suit against said Clark " (the other of the makers) " on the note so given by him, but in which suit they were unable to obtain any security." They also, from time to time, collected from Walkley, another indorser, various sums which appear on the notes themselves. Also on the 18th of October, 1879, they commenced suit against the Charter Oak Life Insurance Company, to enforce the payment of the two notes, and it was not until April, 1883, more than six years after they had " closed and balanced the account of the railroad company upon the books of the bank," and after all parties to the notes had become insolvent, and their right to proceed against the railroad company upon its indorsement had been barred by the statute of limitations, that they first conceived the idea of trying the experiment of opening a new account on the books of the bank against the railroad company, and therein charged the company with this stale claim, including the accrued interest thereon, amounting to $9,792.67, for the purpose of laying a foundation to hold this defendant liable under the bond for the sums due on the notes.

3. Even if the notes now held by the bank were such as could have been charged by the bank to the railroad company, and so be considered an overdraft, the bank has by its conduct released and discharged this defendant from any liability. It has been repeatedly held that a party claiming against a surety cannot recover, if by his negligence or omission he has allowed the security he held for his claim to be lost. 2 White & Tudor's Lead. Cas. in Eq., H. & W. ed., 312; 2 H. & W. Am. Leading Cases, 404. In the last authority the doctrine is held that a surety will be released if the creditor fails to proceed upon the claim in due season, so as to keep it alive. See also *Peacock* v. *Pursell*, 14 C. B., N. S., 728. All the authorities agree that the utmost good faith is required to be observed by a party claiming against a surety. But suppose in this case we concede that, assuming that the notes were properly chargeable to the railroad company as an overdraft, the bank was not bound to proceed at once to collect the notes from the makers or indorsers, and was not bound to give notice to this defendant of his liability for the notes, yet, if the bank was not bound to give notice, it surely had no right to conceal his liability from the defendant. If these notes were properly chargeable to the account of the railroad company, so as to create an overdraft within the terms of the bond, they should have been so charged in such account at once, so that the defendant, by the use of due diligence on his part, might have been able to discover his claimed liability for the same. This was not done, and the defendant had no means of ascertaining his liability. And when on the 23d of November, 1876, the plaintiff's bank closed and balanced the account of the railroad company upon its books, which showed a balance due to the company of $6.24, and paid over to the representatives of the company that balance, this was a declaration by the bank that the account was not overdrawn, and upon this declaration the defendant had a right to rely in full faith and safety. If there was any mistake in thus stating and settling the account, the consequences must fall upon the bank and not upon this

defendant. Had it then appeared that the bank claimed an overdraft on this account by reason of these two notes, the defendant would have had the privilege at least of paying the balance, and thereby being subrogated to the rights of the bank, and would have had an opportunity of securing himself against loss by proceeding against the makers and indorsers of the notes. It is found by the court that when these notes fell due " Arnold, Clark and Walkley, and each of them, were the owners of sufficient real and personal estate standing in their names, free of incumbrance, to have enabled the bank to secure the payment of the notes by attachment, and so continued for several months thereafter." If the bank could have secured the notes, this defendant by indemnifying the bank might have done the same. But the bank neglected to move against either of these parties until 1877, and until after all had become insolvent, and in the meantime had settled its account with the railroad company, thereby assuring the defendant that there was nothing then due upon account for which he was liable, and neglected to notify him that this representation was untrue until more than six years thereafter, and after all means of redress had been lost.

LOOMIS, J. The complaint is founded upon a bond, dated July 11th, 1870, given by the defendant to indemnify the plaintiff bank against loss by reason of its dealings with the Connecticut Valley Railroad Company. The bond and condition are as follows : [They are set out in full, *ante* p. 189.]

The finding would seem to establish the fact that at the commencement of this suit the Connecticut Valley Railroad Company owed the plaintiff bank $9,792.67, being the amount originally credited to the railroad company on account of the accommodation notes of Clark and Arnold, which were discounted by the bank for the benefit of the railroad company and renewed from time to time but never paid.

The question for review is whether the obligation of Hollister is broad enough in its terms and meaning to embrace such an indebtedness. The defendant claims that his liabil-

ity is restricted to such drafts as were at the time when they were presented technical overdrafts. While the argument for such a construction, as given by the learned counsel, had much plausibility, yet we think a broader meaning may be fairly given to the language employed.

The first recital in the condition of the bond mentions the fact that " the railroad company were depositors of money in, and customers and dealers with the bank, and have made and are expected to make drafts and overdrafts on the bank from time to time."

Then follows the agreement of the obligors " in consideration of the premises and *such dealing*," first, that the railroad company would on demand " pay and make good any balance and interest due or to become due at any time " (obviously by reason of such dealing) " and in default, that the bondsmen will, upon demand, pay and satisfy the same and indemnify and save harmless said bank from and against all loss, cost and damage by reason of any such drafts, or overdrafts, *and such indebtedness*, without any notice of any kind," etc. Had it not been the intention to extend the scope of the bond beyond what at the time would be technical overdrafts the general words " and such indebtedness" would not have been added.

Had the parties contemplated a single transaction the strict construction claimed might apply, but they evidently had in view a long course of dealing and the ordinary and regular mode of business between a bank and a large and regular customer. It must have been contemplated that the railroad company would deposit, not only money but mercantile paper of all kinds, and obtain credit therefor before it could be known whether the amount represented by the paper would ever be paid to the bank.

In expressly providing in the bond that " no notice of any kind need be given or suit brought for the purpose of fixing the liability of the said obligors or of any of the parties to said bank," the parties must have referred to commercial paper which the bank might hold, against which checks might

be drawn, and in relation to which notice or a previous suit might be a prerequisite to a recovery unless dispensed with.

We cannot doubt that the parties contemplated that some of the credits to be given the railroad company by the bank for commercial paper might have to be charged back for non-payment, and that drafts paid out of such credits might afterwards become overdrafts within the meaning of the bond. In such case the customer must be presumed to understand that credit is given him in advance upon the implied condition that the paper discounted will be paid and that in case of non-payment it may be charged back.

Suppose a sight draft drawn by the railroad company on a third party payable to the order of the bank and credited to the railroad company in advance of acceptance and checked out by the latter. If subsequently the drafts should be dishonored, would it be any more just or reasonable to hold the bank to the original entries because it gave a fictitious credit, than it would if the deposit had been worthless bank bills and the credit had been given upon the supposition that the bills were good? If then we concede that by the terms of the bond the parties contemplated that the funds credited should all be appropriated and drawn out by means of the checks or drafts of the railroad company, and that the defendant's liability should depend on there being an actual overdraft, we still insist that the question must be determined, not by the state of accounts at the time the check may have been presented and paid, but by the true balance upon a final revision of the accounts after eliminating all fictitious credits.

But we are here confronted with an objection which, if sound, will prevent the application of the above principle to the case at bar. It is claimed that there was no liability at all on the part of the railroad company respecting these notes of Arnold and Clark except as indorser, which was a contingent and not an absolute liability. But it is found that these notes were merely accommodation notes obtained of the makers upon a special guaranty that they should not be required to pay them, and the money on them was asked for

in order to meet a pressing obligation of the railroad company, namely, to pay the coupons of their first mortgage bonds and to save the credit of the company. The transaction could not be regarded merely as a sale of the notes of Arnold and Clark to the bank, but it was to all intents and purposes a loan of money by the bank to the railroad company. *City Bank's Appeal from Commissioners*, 54 Conn., 269.

But it is said that even if the debt in question was covered by the bond, the plaintiff bank by its conduct has released the defendant from liability.

There is no doubt about the general doctrine invoked by the defendant, that diligence and the utmost good faith are required to be observed by a party claiming against a surety, unless it is otherwise provided. But in this case the court has in terms negatived the charge of laches in failing to collect the notes, unless it can be inferred from other facts found, and it cannot be so inferred, because the bond itself in express terms dispenses with all the ordinary prerequisites of diligence, notice, demand or previous suit which might otherwise be necessary in order to subject the surety; and the guaranty was made a continuing one until withdrawn or recalled by a written notice to the bank. There is no pretense that there was ever any such withdrawal or notice, nor did the defendant ever make any suggestion, request or inquiry concerning the matter, so far as the plaintiff is concerned.

The conduct of the plaintiff bank, in paying, on the 23d of November, 1876, to the receiver of the insolvent railroad company the trifling balance then appearing to the credit of the company; the taking of a small real estate security from Arnold on the 19th day of March, 1877, when at the same time he had three or four thousand dollars worth of other real estate; the fruitless suit against Clark brought in May, 1877, and an unsuccessful suit against the Charter Oak Life Insurance Company in October, 1879; the taking of small sums from Walkley from time to time and applying them on the notes; and the delay in finally revising the account against the railroad company until April, 1883, and then for

the first time notifying the defendant Hollister of the purpose to hold him liable on the bond, are not easily to be explained, as no reasons are suggested upon the record. These things would seem to indicate great reluctance to proceed against the defendant, and might naturally be supposed to indicate a possible want of confidence in the claim against him; nevertheless, in view of the strong provisions of the bond, we do not think the above facts constitute a legal defense. It does not appear that the defendant was misled to his prejudice by anything done or omitted on the part of the plaintiff, and the necessary elements of an estoppel against the maintenance of the suit are wanting.

But it is further claimed that if there was error in holding that the claim of the plaintiff was not covered by the provisions of the bond, there was another error in holding that the bond was the personal obligation of the defendant, instead of the bond of the railroad company, and that the meaning of the bond is of no consequence if the real party who gave it is not brought into court. But the decision upon the construction of the bond was against the plaintiff, who appealed to this court, while upon the question who gave the bond, the judgment was wholly against the defendant, who did not appeal. So that we are called upon to reverse an erroneous judgment not appealed from, that we may thereby save an erroneous judgment that was appealed from.

It is quite unusual to apply the principle under such circumstances; still we do not mean to say that it cannot be done. But the error ought to be manifest as matter of law, and if there entered into the judgment any element of fact upon which it may have been based, it ought not to be and cannot be disturbed. In this case the parties, in effect, conceded that, upon the question whether the bond in suit was the bond of Hollister or that of the railroad company, there was an ambiguity on the face of the instrument sufficient to justify a resort to extrinsic evidence, and the court heard the parties in regard to it without the suggestion of any objection on the part of the defendant. Indeed, the second defense distinctly raised such an issue of fact, and pre-

sumably the defendant assumed the burden of proof on that issue.

The court distinctly found that issue for the plaintiff, and found certain special facts applicable, among which were these:—" The draftsman of the bond added the words, ' Treasurer of the Connecticut Valley Railroad Company,' to the name and residence of the defendant in the bond, as descriptive merely of the person who was to sign it. There was no evidence that the defendant had any power, by his signature as treasurer or otherwise, to bind the company by an instrument of this discription ; and I find *that he had no such power.*" This we must regard as conclusive.

The defendant however, even here, in effect asks us to reverse another ruling without bringing the question up by appeal. He says the judgment was a nullity because on its face it shows there was no evidence at all to base it upon. The finding is that there was no evidence that the defendant had any power to bind the company, and then the court adds, " I find that he had no such power." The two things are not necessarily inconsistent, but may well stand together, for there might have been no evidence to show affirmatively such power, while, on the other hand, there might have been much evidence to negative its existence.

There was error in the judgment complained of and it is reversed.

In this opinion the other judges concurred.