******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# O AND G INDUSTRIES, INC. *v.* AMERICAN HOME ASSURANCE COMPANY
## (AC 43135)

Cradle, Alexander and Harper, Js.

*Syllabus*

The plaintiff, a concrete supply company, sought to recover payment under certain surety bonds issued by the defendant, claiming that it had not been paid the amount it was owed for supplying concrete and other materials to the bonds' principal, M Co. M Co. entered into a subcontractor agreement with C Co. to deliver and pour concrete for a construction project. C Co. then engaged the plaintiff to supply concrete materials to C Co. to comply with its subcontractor agreement. After receiving a joint credit agreement and lien waiver from M Co., the plaintiff began supplying concrete and sent invoices directly to M Co., which paid the plaintiff in full. C Co. was unhappy with this arrangement and, thereafter, the plaintiff opened an account with C Co., albeit for a different project. Subsequently, the plaintiff continued to provide C Co. with concrete and charged C Co. directly; however, C Co. did not pay the plaintiff. The plaintiff informed M Co. of C Co.'s nonpayment and M Co. provided payment to C Co. to forward to the plaintiff, but C Co. failed to do so. After C Co. defaulted, the plaintiff sent the defendant a notice of claim under the payment bond, and recorded a mechanic's lien against the owner of the construction project. The defendant issued a substitute bond, as a surety, which the plaintiff accepted as a substitute for its mechanic's lien. Thereafter, M Co. issued a response to the defendant in which it denied that the plaintiff's claim had any merit. The defendant refused to pay the plaintiff under the payment bond or the substitute bond, and the plaintiff brought the present action against the defendant. The defendant asserted nine special defenses against the plaintiff, alleging, inter alia, that the plaintiff acted in bad faith and was reckless in its dealings with C Co. *Held*:

1. The trial court did not err in finding that the defendant failed to sustain its burden of proof in showing that the plaintiff conducted its business with C Co. recklessly, in bad faith, or with a dishonest purpose in providing C Co. with its own account, not demanding payment immediately upon default, or bringing an action on the unpaid balance, as the court's factual findings and the evidence in the record supported the court's conclusions; the plaintiff was not a party to the payment bond agreement, the plaintiff took more protective steps than the defendant, which had failed to include any provisions in its bond agreement to require M Co., who brought C Co. into the construction project, to complete credit checks on subcontractors before bringing them onboard, the plaintiff did not act recklessly where it took reasonable steps to execute a joint check agreement with M Co., M Co. was on notice that C Co. had not been forwarding payment to the plaintiff, yet M Co. continued advancing payment for the materials directly to C Co., and there was sufficient evidence to support the court's finding that the plaintiff's conduct in continuing to supply materials to C Co. for the project did not rise to the level of common-law recklessness.

2. The defendant cannot prevail on its claim that the trial court erred in finding that the plaintiff satisfied the express condition precedent to a valid claim as delineated in the payment bond, namely, that the plaintiff provide the defendant with a copy of the plaintiff's written contract or purchase order with C Co., as the court's finding that the forty-five invoices submitted to the defendant, which set forth the relationship between C Co. and the plaintiff, were sufficient to comply with the provisions of the payment bond; there was no dispute that the plaintiff supplied materials to C Co. for the construction project for which the plaintiff was not paid, and the plaintiff attached the invoices with its proof of claim form, indicating that C Co. and the plaintiff had an ongoing agreement for the materials to be supplied to C Co. for the benefit of the project; moreover, the payment bond failed to exclude any specific type of agreements or to indicate that proof of certain types of agree-

ments were disallowed upon making a claim.

3. This court declined to review the merits of the defendant's claim that the trial court erred by allowing the plaintiff to recover damages in excess of the penal sum of the substitute bond; the defendant raised no objections at trial regarding the award of prejudgment or offer of compromise interest as part of the damages award, or the court's calculus of its award.

4. The trial court did not abuse its discretion by allowing the plaintiff to present rebuttal evidence after the defendant rested without introducing any evidence or testimony during its case-in-chief when the defendant pleaded special defenses and partly geared its lengthy cross-examination of the plaintiff's sole witness toward addressing those special defenses; because the court had the sound discretion as to the order of its proceedings and because the court had barred the plaintiff from addressing the defendant's special defenses in its case-in-chief on the basis that those special defenses had not yet been raised, the court properly allowed rebuttal evidence limited only to the defendant's special defenses; the plaintiff's rebuttal was not presented to bolster its case-in-chief but, rather, to refute or contradict the evidence the defendant put forth during its cross-examination of the plaintiff's witness concerning the defendant's special defenses, and the documents that the defendant admitted during that cross-examination, which as the defendant conceded, were evidence.

Argued November 9, 2020—officially released May 18, 2021

*Procedural History*

Action to recover damages for, inter alia, the defendant's denial of the plaintiff's claim for failure of payment by a principal under certain bonds issued by the defendant as surety, brought to the Superior Court in the judicial district of Stamford-Norwalk, where it was tried to the court, *Tierney, J.*; judgment for the plaintiff, from which the defendant appealed to this court. *Affirmed.*

*Louis R. Pepe*, with whom was *Rory M. Farrell*, for the defendant (appellant).

*Jared Cohane*, with whom was *Timothy T. Corey*, for the plaintiff (appellee).

*Opinion*

HARPER, J. The defendant, American Home Assurance Company, appeals from the judgment of the trial court rendered in favor of the plaintiff, O & G Industries, Inc., finding that the plaintiff was entitled to payment under certain bonds issued by the defendant as surety, including a payment bond and a bond (substitute bond) that had been substituted for the discharge of a mechanic's lien filed by the plaintiff in connection with materials it had furnished for a construction project. On appeal, the defendant claims that the court erred by (1) failing to find that the plaintiff breached its obligation of "diligence and utmost good faith" owed to the defendant, (2) finding that the plaintiff satisfied the condition precedent to the payment bond, (3) allowing the plaintiff to recover beyond the penal sum of the mechanic's lien bond, and (4) allowing the plaintiff to put on a rebuttal case after the defendant had rested its case without calling any witnesses or introducing any evidence.[1] We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, either found by the court or undisputed in the record, and procedural history are relevant to our resolution of this appeal. The plaintiff is a producer and supplier of construction materials, including concrete, with a place of business in Torrington. A large scale, eighteen-story residential apartment building construction project (project) in Stamford commenced at 1011 Washington Boulevard, which is owned by Stamford Phase Four JV, LLC (owner). The owner and The Morganti Group, Inc. (Morganti), the general contractor, entered into a construction contract on January 28, 2016. The first executed payment bond was an agreement between the owner as the obligee, Morganti as the principal, and the defendant as the surety. The defendant served as surety on the payment bond and a performance bond. Those bonds were issued by the defendant, each in the penal sum of $53,690,000, naming Morganti as the bonded principal.

On January 31, 2016, Morganti entered into a written subcontractor agreement with Concrete Superstructures, Inc. (CSS), of Bloomfield. Morganti hired CSS to deliver and pour concrete for the project. The subcontract price was $3,710,000. CSS then contacted the plaintiff and requested that the plaintiff supply materials to CSS so that CSS could fulfill its obligations to Morganti under the subcontractor agreement. CSS submitted a credit application and credit agreement to the plaintiff in April, 2016, after receiving a price quotation from the plaintiff. The Redi-Mix price quotation provided CSS with a list of items for sale, their prices, and payment and billing information. The credit agreement included the billing and credit conditions that governed the agreement between CSS and the plaintiff. The plaintiff conducted a credit check on CSS and the personal guar-

antor, Douglas Cartelli, and decided not to extend credit to CSS for the project at that time and put the application aside. In July, 2016, Morganti sent the plaintiff a joint check agreement and lien waiver. The plaintiff then supplied the concrete and other related materials called for in the subcontract to CSS and delivered them to the site from April until September, 2016. During that time period, the plaintiff sent invoices directly to Morganti for the materials and was paid in full by Morganti for a total value of $385,988. On July 20, 2016, CSS e-mailed the plaintiff to express its displeasure with the plaintiff's choice to continue to bill Morganti directly instead of directly dealing with CSS. CSS threatened to use a different concrete supplier if the plaintiff did not open an account for CSS and bill CSS directly. The plaintiff then reconsidered CSS' credit application on August 11, 2016, and approved CSS for a credit limit of $3000; however, the account was for a project unrelated to the Washington Boulevard project at issue. The joint check agreement previously sent to the plaintiff in July, 2016, was returned to Morganti in September, 2016, with amendments, including the redaction of the lien waiver provision. While the amended joint check agreement was under review by Morganti, the plaintiff furnished construction supplies to CSS from September 3 through December 2, 2016, for a total value of $484,919.30, but charged CSS directly instead of Morganti. Morganti informed the plaintiff on November 1, 2016, that the plaintiff's amended joint check agreement had been denied. The plaintiff also informed Morganti on or about November 1, 2016, that CSS had yet to pay for any of the materials the plaintiff had furnished for the project since September, 2016, with a total balance owed of approximately $255,512. Morganti gave CSS another $225,000 after being informed of the balance due to the plaintiff, which had been paid timely up until September, 2016. For each transaction between September and December, 2016, CSS would request payment from Morganti in order to pay the balance owed to the plaintiff for the deliveries. Although Morganti made payments to CSS that CSS was supposed to use to pay the plaintiff, CSS did not forward the payments to the plaintiff. Consequently, CSS defaulted after accruing a $484,919.30 balance that it owed to the plaintiff.

The parties also stipulated to the following facts. The materials delivered by the plaintiff to CSS from September through December, 2016, were all billed to CSS under a credit account that CSS had opened with the plaintiff on or about August 11, 2016, for a project that was taking place in Norwalk—the Wall Street Theater project.[2] The delivery tickets and invoices showed that the plaintiff's supplies were sold to CSS only and were not sold or delivered to any other party. It is undisputed that CSS failed to pay the plaintiff for the materials it delivered to the project between September

and December, 2016. Moreover, there is no dispute as to the quality or value of the materials that the plaintiff had delivered to CSS.

On February 2, 2017, the plaintiff mailed the defendant a notice of claim under the payment bond after CSS had defaulted. The plaintiff sent timely notice to Morganti of its intent to file a mechanic's lien. The plaintiff then proceeded to record a mechanic's lien against the owner's Washington Boulevard property on February 28, 2017, to secure payment for the materials that the plaintiff had provided to the project. There is no dispute that the mechanic's lien was filed timely. In response, on March 6, 2017, the defendant issued the substitute bond, as a surety, in the penal sum of $533,411.23, which the plaintiff accepted as a substitute for its mechanic's lien pursuant to General Statutes § 49-37.[3]

On March 16, 2017, Morganti issued a response to the defendant as to the plaintiff's claim under the payment bond, effectively denying that the plaintiff's claim had any merit. The defendant later denied the plaintiff's claim on April 6, 2017. After multiple correspondences between the plaintiff and Morganti, the defendant sent an e-mail on May 5, 2017, to the plaintiff and Morganti affirming its decision to deny the plaintiff's claim and refused to pay the plaintiff under both the payment bond and the substitute bond.

The plaintiff then brought this action against the defendant, claiming that it had not been paid the amount owed under the substitute bond of $484,919.30. As the trial court delineated in its memorandum of decision, "[t]he operative complaint is the first amended complaint dated July 25, 2017. . . . It is a two count complaint with each count claiming damages in the same amount of $484,919.30. The first count seeks that amount of damages based upon a bond substituted for the discharge of a $484,919.30 mechanic's lien issued by the plaintiff . . . on February 28, 2017. . . . The defendant . . . supplied that bond on March 6, 2017 . . . in the amount of $533,411.23. The second count is a suit against the defendant . . . by the plaintiff . . . on [the] payment bond issued by [the defendant] as surety to the project contractor . . . [Morganti] . . . . The plaintiff claim[ed] damages on the second count in the amount of $484,919.30 plus interest, costs and attorney's fees. The operative answer is the November 20, 2017 amended answer and special defenses. . . . Nine special defenses have been asserted by [the defendant] in [its] eleven page amended answer and special defenses . . . ." (Citations omitted.)

In its nine special defenses, the defendant alleged that (1) the plaintiff's reckless conduct in how it conducted business with CSS by allowing CSS to have its own account, despite CSS being deemed not creditworthy, and by failing to demand timely payments, exposed the

plaintiff, the defendant, Morganti, and the owner to an unreasonable risk that CSS would run up a large, unpaid balance, (2) the plaintiff's claims were barred by the doctrine of unclean hands as a result of the plaintiff's reckless, unreasonable, and unfair conduct, (3) the plaintiff's claims were barred by the doctrine of avoidable consequences and/or its failure to mitigate its damages, (4) the plaintiff's claims were barred by the doctrine of estoppel, (5) the plaintiff's claims were barred by the doctrine of laches because it had failed to take action to address the inability of CSS to submit timely payments, (6) the plaintiff's claims against the defendant were barred in their entirety because both the owner and Morganti, as bond principal for the defendant, had paid in full for all of the concrete material furnished by the plaintiff to CSS for the project, (7) the plaintiff's substitute bond claim was "barred to the extent that its underlying mechanic's lien was invalid pursuant to [General Statutes] § 49-33 et seq. because the lien amount [was] overstated and because no amounts [were] due and owing [to the plaintiff] from the owner, Morganti, or [the defendant]," (8) the plaintiff's payment bond claim was barred because the plaintiff had not "submitted a valid '[c]laim' in accordance with the terms and conditions of the payment bond and, therefore, [had] not satisfied all conditions precedent to recovery under the payment bond," and (9) the plaintiff's claims were "barred, in whole or in part, because the contract that [the plaintiff was] seeking to enforce [was] an oral contract for the sale of goods in excess of $500 and, therefore, unenforceable pursuant to . . . [General Statutes] § 42a-2-201."[4] In essence, the plaintiff alleged in its complaint that it was not paid in full by either CSS or Morganti. The plaintiff made a claim against the defendant by reason of the defendant's issuance of the two bonds—the payment bond and the substitute bond. After a five day trial, the court concluded that the plaintiff had carried its burden and proved that it was entitled to damages for breach of the payment bond and the substitute bond, and that the defendant's first five special defenses, which were equitable in nature, were not applicable to the plaintiff's claims at law on the surety bonds. Notwithstanding that determination, the court did, in fact, examine the merits of the defendant's first five special defenses and found, in the alternative, that the defendant had failed to sustain its burden of establishing those special defenses.[5] Specifically, the court found that the defendant failed to sustain its burden of showing that the plaintiff's conduct amounted to common-law recklessness, bad faith, or unclean hands. The court also found in favor of the plaintiff as to the remaining special defenses. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant claims that the court erred when it

found that the defendant had failed to sustain its burden of proving that the plaintiff's conduct was reckless and unreasonable, and breached the obligation of "diligence and the utmost good faith." We disagree.

We set forth the appropriate standard of review and relevant legal principles for this claim. A court's factual findings underlying its determination that a party failed to sustain its burden of proof will not be disturbed on appeal unless they are clearly erroneous. See *Schiavone* v. *Bank of America*, *N.A.*, 102 Conn. App. 301, 304, 925 A.2d 438 (2007); *Kelman* v. *McDonald*, 24 Conn. App. 398, 400–401, 588 A.2d 667 (1991). As such, "the court's finding that the [defendant] failed to meet [its] burden of proof" must be "supported by facts in the record and reasonable inferences drawn therefrom." *Schiavone* v. *Bank of America*, *N.A.*, supra, 304. "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Citation omitted.) *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

"We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." Id., 222. "The [fact-finding] function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." (Internal quotation marks omitted.) *Cavolick* v. *DeSimone*, 88 Conn. App. 638, 646, 870 A.2d 1147, cert. denied, 274 Conn. 906, 876 A.2d 1198 (2005). "In reviewing the trial judge's factual findings, we give the evidence the most favorable reasonable construction in support of the judgment." (Internal quotation marks omitted.) *Kelman* v. *McDonald*, supra, 24 Conn. App. 401. Further, "the defendant bears the burden of proof on [its] special defense(s)." *Kaye* v. *Housman*, 184 Conn. App. 808, 817, 195 A.3d 1168 (2018). The defendant must prove the allegations in its special defenses by a fair preponderance of the evidence in a civil trial. See *Ramsay* v. *Camrac, Inc.*, 96 Conn. App. 190, 206, 899 A.2d 727, cert. denied, 280 Conn. 910, 908 A.2d 538 (2006).

The following facts and procedural history are relevant to our resolution of this claim. The defendant's first five special defenses alleged that the plaintiff engaged in reckless, unreasonable and unfair conduct, and that the plaintiff's claims were barred by the doctrines of unclean hands, avoidable consequences and/or its failure to mitigate its damages, estoppel and laches. Special defenses two through five incorporated the first special defense by reference. Before the commencement of trial, the court ordered the parties to file pretrial briefs addressing their legal claims and applicable law. In its pretrial brief, the defendant claimed, inter alia, that the plaintiff was not entitled to recovery under the bonds because the plaintiff had failed to exercise "diligence and utmost good faith" by conducting business with CSS in a "commercially unreasonable" manner. The defendant also likened the requirement of "diligence and utmost good faith" to the implied covenant of good faith and fair dealing.

After a five day trial, in light of its factual findings, the court found that the defendant had failed to sustain its burden of proof as to its special defenses. In doing so, the court determined that the defendant's first five special defenses were equitable in nature and could be summarized as alleging that the plaintiff's conduct amounted to common-law recklessness, bad faith in the performance of contractual obligations amounting to a breach of the implied covenant of good faith and fair dealing, and a violation of the equitable concept of unclean hands. In its memorandum of decision, the court discussed *Aetna Bank* v. *Hollister*, 55 Conn. 188, 212, 10 A. 550 (1886), and *Wolthausen* v. *Trimpert*, 93 Conn. 260, 269, 105 A. 687 (1919), cases on which the defendant relied for its claim that the plaintiff's reckless conduct discharged the defendant of any duty to pay the plaintiff under the surety bonds.

In its analysis, the court noted that neither of the century old cases to which the defendant had cited explained what the phrase "diligence and utmost good faith" required. The court specifically noted that *Wolthausen* merely established when a party's conduct is *not* negligent under the "utmost good faith" standard. The court determined that the defendant's claim was similar to the contractual principle of the implied covenant of good faith and fair dealing enunciated in *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, 189 Conn. 401, 407, 456 A.2d 325 (1983), in which our Supreme Court equated the phrase "utmost good faith" with "fair dealing."[6]

The court thereafter explained that it had to determine "what standards must be shown by the defendant to defeat the plaintiff's claim upon the bond based on the plaintiff's omissions or commissions." The court determined that it would need to assess the plaintiff's conduct through the "lens of common-law recklessness,

unclean hands, and bad faith" to establish whether the plaintiff was barred from recovery because the defendant, in essence, alleged that the plaintiff's conduct discharged the defendant from any obligation to pay under the surety bonds.[7] (Internal quotation marks omitted.)

Furthermore, the court explained that, because the court in *Pacelli* likened "utmost good faith" to "fair dealing," the defendant would need to show that the plaintiff had acted in bad faith amounting to a breach of the implied covenant of good faith and fair dealing where the defendant deemed the plaintiff's conduct to be "reckless," "unfair," and "unreasonable." Thus, as it pertained to the defendant's claim that the plaintiff breached the obligation of "diligence and the utmost good faith," the court determined that the defendant had to show that the plaintiff acted in bad faith and that a contract existed, which is also required to establish a breach of the implied covenant of good faith and fair dealing.

The defendant sought to establish that the plaintiff acted in bad faith by engaging in reckless conduct in its dealings with CSS. The court interpreted the defendant's claim that the plaintiff engaged in reckless conduct as an allegation rooted in common-law recklessness. The court then concluded that the defendant failed to show that the plaintiff's conduct amounted to common-law recklessness. In support of that conclusion, the court found that, because the plaintiff played no part in bringing the defaulting party, CSS, into the construction project, Morganti or the defendant should have conducted credit checks on CSS. Moreover, the plaintiff was not a party to a contract with the owner, Morganti, or the defendant, as CSS was the party that sought out the plaintiff, which sold and delivered the materials and supplies to CSS only, and requested that the plaintiff supply materials to CSS. Therefore, the plaintiff had no contractual obligations to the defendant outside of what it was required to submit for a valid claim against the payment bond. Additionally, the court found that the plaintiff's failure to institute an action against CSS was not unreasonable because there was a compelling and reasonable inference created from the evidence produced at trial that CSS was judgment proof at the time its contract was terminated and thereafter. Thus, the court found that the defendant failed to sustain its burden of proof as to the allegations of common-law recklessness and bad faith by the plaintiff. In essence, the court found that, because the defendant failed to show that the plaintiff's conduct amounted to common-law recklessness, it failed to sustain its burden of proof that the plaintiff acted in bad faith.

On appeal, the defendant claims that the court committed reversible error when it found that the plaintiff's conduct did not bar the plaintiff from recovering under

the surety bonds. The defendant relies on *Aetna Bank* v. *Hollister*, supra, 55 Conn. 212, and *Wolthausen* v. *Trimpet*, supra, 93 Conn. 269, in asserting that the plaintiff breached the standard of care owed to the defendant. The defendant claims that the plaintiff's reckless conduct should discharge the defendant, as the surety, from its obligation to pay the plaintiff under the surety bonds because the court in *Aetna Bank* proclaimed that "diligence and the utmost good faith are required to be observed by a party claiming against a surety." *Aetna Bank* v. *Hollister*, supra, 212. The plaintiff counters that the cases cited by the defendant to buttress its argument are more than a century old and were decided before the development of modern construction suretyship law. The plaintiff distinguishes *Aetna Bank* by demonstrating that the court in *Aetna Bank* rejected the surety's argument that it should be discharged from any indemnity obligations for lack of notice when the bank waited years before deciding to bring an action on the bond The court in *Aetna Bank* rejected the surety's argument and found for the bank because the bond contained no express notice requirement, and, thus, it could not be said that the bank failed to adhere to a "duty of diligence and utmost good faith." Id. In the present case, the court determined that the defendant's reference to a duty of "diligence and the utmost good faith" is comparable to the implied covenant of good faith and fair dealing. We agree with the court's well reasoned analysis.

Because the defendant's bad faith claim hinges on whether the plaintiff's conduct amounts to "unreasonable" and reckless conduct, we first determine whether the evidence in the record supports the court's finding that the plaintiff's conduct did not amount to common-law recklessness.

With regard to common-law recklessness, "[u]nder Connecticut common law, [r]ecklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable [person], and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent. . . . [W]e have described recklessness as a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . The result is that . . . reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."

(Emphasis omitted; internal quotation marks omitted.) *Williams* v. *Housing Authority*, 159 Conn. App. 679, 693–94, 124 A.3d 537 (2015), aff'd, 327 Conn. 338, 174 A.3d 137 (2017).

As the court in the present case noted, the blame the defendant assigns to the plaintiff is misplaced. There was sufficient evidence to support the court's finding that the plaintiff took more protective steps than the defendant, who had failed to include any provisions in its bond agreement to require Morganti, who brought CSS into the fold, to complete credit checks on subcontractors before bringing them onto the project. The evidence shows that Morganti also had sent the plaintiff a joint check agreement in July, 2016, which included a provision stating that it would not give the plaintiff any right "to file or maintain a lien or claim for alleged nonpayment for any labor, materials or services performed on the [p]roject, against the [o]wner . . . or the [c]onstruction [m]anager or its sureties." That provision, as found by the court, implicated the plaintiff's right to file a mechanic's lien, which contravenes General Statutes § 42-158*l*.[8] The plaintiff amended the joint check agreement, redacted the portion of it that implicated the plaintiff's right to file a mechanic's lien, and returned the agreement to Morganti in September, 2016, but Morganti refused to enter into the joint check agreement with the plaintiff unless the plaintiff accepted the redacted provision in the agreement.

The evidence in the record supports the finding that the plaintiff did not act recklessly when the plaintiff took reasonable steps to execute a joint check agreement with Morganti. The joint check agreement would have required Morganti to issue a check with both the plaintiff and CSS identified as payees. Moreover, as the testimony at trial established, Morganti was on notice that CSS had not been forwarding payments to the plaintiff by the fall of 2016, yet Morganti continued advancing payment for the materials directly to CSS. Accordingly, there was sufficient evidence to support the court's finding that the plaintiff's conduct in continuing to supply materials to CSS for the project did not rise to the level of common-law recklessness.

Likewise, the evidence supports the court's finding that the defendant failed to sustain its burden of showing that the plaintiff acted in bad faith. "[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . .

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose. . . .

"Accordingly, because the covenant of good faith and fair dealing only requir[es] that neither party [to a contract] do anything that will injure the right of the other to receive the benefits of the agreement, it is not implicated by conduct that does not impair contractual rights." (Citation omitted; internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 794–95, 67 A.3d 961 (2013). "[T]he existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing." *Hoskins* v. *Titan Value Equities Group, Inc.*, 252 Conn. 789, 793, 749 A.2d 1144 (2000).

The defendant relies on the plaintiff's decision to provide CSS with its own account and not to demand payment immediately or to bring an action on the balance as indicia that the plaintiff failed to act in good faith. That claim fails because, as the court noted, the defendant had no contract with the plaintiff, nor did the court find any facts to support the defendant's claim that the plaintiff acted in bad faith or with a dishonest purpose.[9]

In summary, the court's factual findings supporting its conclusions that the defendant failed to show that the plaintiff conducted its business with CSS recklessly, in bad faith or with a dishonest purpose, and that the plaintiff was not a party to the payment bond agreement are fully supported by evidence in the record. Thus, we agree with the court's finding that the defendant failed to sustain its burden of proof in showing that the plaintiff's conduct was reckless and in bad faith. Accordingly, the defendant's claim must fail.

II

The defendant next claims that the court erred in finding that the plaintiff satisfied the express condition precedent to a valid claim as delineated in the payment bond, namely, that the plaintiff provide the defendant with a copy of the plaintiff's written contract or purchase order with the subcontractor, CSS. We are not persuaded.

We begin by setting forth the standard of review and

relevant legal principles. To the extent that we interpret any of the payment bond provisions, "[i]f a contract is unambiguous within its four corners, the determination of what the parties intended by their contractual commitments is a question of law. . . . When the language of a contract is ambiguous, [however] the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous. . . . In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *Winthrop* v. *Winthrop*, 189 Conn. App. 576, 581–82, 207 A.3d 1109 (2019).

"Whether the language is ambiguous is itself a question of law, upon which our review on appeal is de novo. . . . In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . Contract language is unambiguous when it has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." (Citation omitted; internal quotation mark omitted.) *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, 146 Conn. App. 169, 187, 78 A.3d 167 (2013), aff'd, 322 Conn. 541, 153 A.3d 574 (2016).[10]

Moreover, the determination that the plaintiff satisfied all of the conditions precedent to the payment bond is a factual finding, "and it is axiomatic that [t]he trial court's [factual] findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *McKay* v. *Longman*, 332 Conn. 394, 417, 211 A.3d 20 (2019).

The following additional facts are relevant to this claim. Section 16 of the payment bond agreement sets out relevant definitions applicable to the payment bond. Section 16.1 defines what constitutes a valid claim under the payment bond and what is minimally required to make a valid claim.[11] The plaintiff sent the defendant a notice of claim under the payment bond on February 2, 2017. On February 23, 2017, a representative for the defendant sent the plaintiff a proof of claim form for the plaintiff to complete in order to submit its claim.

The proof of claim form required, inter alia, information about the claimant, a description of the services or materials provided for the project, the dates of the deliveries or services provided, the name of the contractor or subcontractor that was furnished the services or materials, a copy of invoices and delivery tickets, and the amount due to the claimant. The plaintiff submitted the proof of claim form on March 2, 2017. The plaintiff's proof of claim form also included, inter alia, an attachment of forty-five unpaid invoices, which showed that it had not been paid for the materials it had delivered to CSS. Morganti disputed the claim by way of a letter sent to the defendant's claims representative on March 16, 2017, stating that the plaintiff's bond claim was without merit and that neither the defendant nor Morganti was liable to the plaintiff for any unpaid balances. Specifically, Morganti's response indicated that the plaintiff's claim should not be paid because the plaintiff failed to include a copy of any contract or purchase order between the plaintiff and CSS; therefore, it could not be ascertained if the amount included on the form submitted by the plaintiff was an accurate reflection of the balance owed. The defendant thereafter denied the plaintiff's claim in a letter dated April 6, 2017, asserting that it was denying the plaintiff's claim because it was "not in a position to intercede [to] make payment of the amounts claimed" because there appeared to be "legitimate issues of controversy between Morganti and the [plaintiff]." The plaintiff sent the defendant a letter dated April 10, 2017, contesting the bases set forth in Morganti's March 16, 2017 letter. Morganti then sent the defendant's claims representative a letter dated May 3, 2017, reiterating the reasons it believed the plaintiff's claim must be denied. The defendant confirmed its denial of the plaintiff's claim in an e-mail sent to the plaintiff and Morganti on May 5, 2017.

At trial, Robert Jonke, the plaintiff's credit manager and sole testifying witness, testified that there was a signed credit agreement between CSS and the plaintiff, along with signed delivery tickets, invoices, and a price quotation. Jonke also stated that each verbal order CSS placed was confirmed by written delivery tickets, which included a list of the materials ordered.

The court looked to the terms of the payment bond and found that there was no condition in the agreement stating that oral agreements were unacceptable, nor was there a requirement that the agreement or contract be executed in one single document. The court found that the plaintiff had satisfied all of the conditions of the payment bond. Particularly, the court found that exhibit 51, which included the notice of claim, satisfied "items 1, 2, 4, 5, 6, 7, and 8 of § 16.1 of the payment bond." Moreover, the court found that item 3 of § 16.1 of the payment bond, which called for the submission of a copy of an agreement or purchase order, was satisfied by exhibit 67, which included the signed delivery

tickets and invoices on the plaintiff's business letterhead. Additionally, the court found that the documents contained in exhibits 5 and 6, which included the Redi-Mix price quotation and materials price quotation, and the credit agreement executed by CSS and the plaintiff, also satisfied item 3 of § 16.1.[12] The defendant claimed that only invoices were submitted. Nevertheless, the court found that the plaintiff established by a preponderance of the evidence that there was indeed an agreement between CSS and the plaintiff, and the documents the plaintiff provided satisfied the condition precedent of § 16.1 of the payment bond.

On appeal, the defendant claims that the court erred in finding that the plaintiff fulfilled the prerequisite to receiving payment under the payment bond.[13] The defendant contends that the plaintiff failed to furnish any agreements or purchase orders between CSS and the plaintiff. The defendant claims that § 16.1 of the payment bond agreement requires all claimants, such as the plaintiff, to submit at least a "copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in performance of the [c]onstruction [c]ontract . . . ." According to the defendant, the plaintiff did not submit a written document detailing the agreement between the plaintiff and CSS for purchase of the materials, and the documents relied on by the court were not indicative of an agreement. The defendant claims that neither the Redi-Mix price quotation nor the materials price quotation relied on by the court was signed by CSS. Moreover, the defendant argues that many delivery tickets were unsigned by CSS and the signed delivery tickets included no terms and conditions of the sale so as to constitute a written agreement. The defendant further contends that the bulk of the documents on which the court relied to establish a contractual relationship or agreement between CSS and the plaintiff were never submitted to the defendant. The defendant identifies this as an indispensable condition precedent that bars the plaintiff's ability to recover because the defendant is entitled to review the agreement between a subcontractor and a supplier, such as the plaintiff. Finally, the defendant takes issue with the fact that the agreement between CSS and the plaintiff was "only an oral agreement" and the plaintiff sent invoices instead of a written agreement or purchase order.

"Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in the light of the circumstances surrounding the execution of the instrument." (Internal quotation marks omitted.) *Pack 2000, Inc.* v. *Cushman*, 311 Conn. 662, 676–77, 89 A.3d 869 (2014). "A condition is an event, not certain to occur, which must occur . . . before performance under a contract becomes due. . . . If the condition is

not fulfilled, the right to enforce the contract does not come into existence." (Citation omitted; internal quotation marks omitted.) *Feinberg* v. *Berglewicz*, 32 Conn. App. 857, 860, 632 A.2d 709 (1993).

Jonke testified at trial that each order placed by CSS was orally agreed to and memorialized or confirmed by invoices and delivery tickets. Item 3 of § 16.1 of the payment bond calls for a copy of an agreement or purchase order that evidences the labor, materials or equipment furnished for use in the project. It can reasonably be inferred that the purpose of item 3 is for the defendant to be provided with evidence that there existed an agreement between the claimant and a contractor or subcontractor to provide materials, labor, or equipment for the project. The information in the invoices identified CSS as the party receiving the labor, materials or equipment; provided an itemized list with a description of the services, materials or supplies delivered to CSS; and included the total price, the invoice date, and where the delivery took place. The invoices were also on the plaintiff's letterhead. The invoices submitted by the plaintiff set out exactly what materials the plaintiff agreed to furnish to CSS. Item 3 of § 16.1 of the payment bond makes no mention of a requirement of a written agreement being necessary for the claim to be deemed valid.

There is no dispute that the plaintiff supplied materials to CSS for the project for which the plaintiff was not paid. The plaintiff provided the defendant with forty-five invoices with its proof of claim indicating that CSS and the plaintiff had an ongoing agreement for the materials to be supplied to CSS for the benefit of the project. The defendant acknowledges that there was such an agreement between the plaintiff and CSS but, nevertheless, challenges the form in which the plaintiff supplied proof of that agreement. The payment bond failed to exclude any specific type of agreements or to indicate that proof of certain types of agreements was disallowed upon making a claim.

Because we agree with the court's conclusions concerning the interpretation of the payment bond, we conclude that the court's finding that the forty-five invoices submitted to the defendant, which set forth the relationship between CSS and the plaintiff, were sufficient to comply with item 3 of § 16.1 of the payment bond was supported by the evidence. Thus, there was no error.

### III

The defendant next claims that the court erred by allowing the plaintiff to recover damages in excess of the penal sum of the substitute bond.[14] For the reasons that follow, we decline to review the merits of this claim.

The following facts and procedural history are relevant to this claim. As noted previously, the plaintiff had

recorded a mechanic's lien against Morganti for the balance owed on account of the materials it had supplied to the project. Thereafter, the plaintiff, Morganti, and the defendant executed the substitute bond agreement whereby the plaintiff agreed to discharge the mechanic's lien and transfer the mechanic's lien to a substitute bond, which the defendant posted as surety. Morganti and the defendant agreed to be bound to the plaintiff for up to $533,411.23, which covered the mechanic's lien of $484,919.30 and included an additional $48,491.93, the amount included for costs and interest pursuant to § 49-37. In May, 2018, the plaintiff filed an offer of compromise with the court offering to settle all of its claims against the defendant if the defendant paid the plaintiff $460,000. The defendant failed to respond to, or to take action on, the plaintiff's offer of compromise.

After finding that the $484,919.30 amount due to the plaintiff had been wrongfully withheld by the defendant, the court rendered judgment on both counts of the complaint in favor of the plaintiff and awarded the plaintiff a total of $628,403, with attorney's fees to be determined after a postjudgment hearing.[15] The court's calculus included the $484,919 damages owed to the plaintiff, $57,930 in prejudgment interest, and $85,554 in offer of compromise interest.

With respect to the prejudgment interest, the court, in its discretion, awarded the plaintiff prejudgment interest of 5 percent per annum pursuant to General Statutes § 37-3a, which provides in relevant part that, "[e]xcept as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten percent a year, and no more, may be recovered and allowed in civil actions . . . including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ." The court also awarded the plaintiff offer of compromise interest pursuant to General Statutes § 52-192a (c), which authorizes the court to add interest of 8 percent per annum if "the plaintiff made an offer of compromise which the defendant failed to accept," and the plaintiff recovers "an amount equal to or greater than the sum certain specified in the plaintiff's offer of compromise . . . ." The court then indicated that a postjudgment hearing would take place in order for the parties to address issues concerning the calculation of attorney's fees, offer of compromise interest and prejudgment interest. The court also allowed the parties to "file a timely procedurally correct motion to reargue concerning the determination of interest in any form and the calculation thereof." Neither party submitted a motion to reargue regarding the damages award nor did either party raise any objections as to the court's calculations.[16]

The defendant's claim is waived because it raised no objections at trial regarding the award or the court's

calculus. "Generally, to preserve an issue for review, a party must . . . object or otherwise assert such issue. A party cannot preserve a claim through inaction but, instead, must engage in affirmative conduct at an appropriate time." *MBNA America Bank, N.A.* v. *Bailey*, 104 Conn. App. 457, 467, 934 A.2d 316 (2007). "[T]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Ed Lally & Associates, Inc.* v. *DSBNC, LLC*, 145 Conn. App. 718, 729, 78 A.3d 148 (2013)

Thus, because the defendant failed to raise any objections at trial concerning the court's award of prejudgment and offer of compromise interest as part of its damages award, this claim is waived and an analysis of its merits is not warranted.

### IV

The defendant next claims that the court erred in allowing the plaintiff to put on a rebuttal case after the defendant rested its case without calling any witnesses or introducing any evidence. We disagree.

We first set forth the standard of review for this claim. "It is well settled that the admission of rebuttal evidence lies within the sound discretion of the trial court." (Internal quotation marks omitted.) *Boone* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 335 Conn. 547, 573, 239 A.3d 1175 (2020). "Our standard of review of the [defendant's] claim is that of whether the court abused its discretion in allowing this . . . testimony. . . . Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . It goes without saying that the term abuse of discretion . . . means that the ruling appears to have been made on untenable grounds. . . . In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action." (Citation omitted; internal quotation marks omitted.) *Cafro* v. *Brophy*, 62 Conn. App. 113, 118–19, 774 A.2d 206, cert. denied, 256 Conn. 933, 776 A.2d 1149 (2001). "This court will affirm a trial court's admission of rebuttal evidence which would have been normally presented as part of the case-in-chief unless the party claiming error sustains his burden of establishing harmful error." *State* v. *Lisella*, 187 Conn. 335, 337–38, 445 A.2d 922 (1982).

At trial, the defendant rested without calling any witnesses regarding its special defenses; however, the defendant did cross-examine Jonke, the only witness presented at trial by the plaintiff. The defendant cross-examined Jonke for several days and also admitted various documents as exhibits concerning its special

defenses during the plaintiff's case-in-chief. The court did not allow the plaintiff to submit evidence to rebut the defendant's special defenses in its case-in-chief. Instead, after the defendant rested and over the defendant's objection, the court allowed the plaintiff to call Lawrence Rosati as a rebuttal witness based on the defendant's cross-examination. Rosati served as Morganti's project executive on the construction project in question. The court also allowed the plaintiff, over the defendant's objection, to introduce e-mail correspondence between CSS and Morganti, as well as spreadsheets created by CSS for billing requests submitted to Morganti, in order for the plaintiff to establish that Morganti continued to give CSS money even after Morganti was on notice that CSS had not been paying the plaintiff. The spreadsheets purportedly showed that there was a sum due to the plaintiff in early fall of 2016. Before determining that the plaintiff was allowed to put forth the rebuttal witness, the court heard the parties' arguments as to whether the plaintiff was permitted to proceed with its witness. The plaintiff posited that it was calling the rebuttal witness "[b]ecause there was evidence produced during cross-examination" by the defendant addressing the defendant's special defenses. The plaintiff also argued that it should be allowed to put on the rebuttal witness because the court barred the plaintiff from putting on any evidence in its case-in-chief to address the defendant's special defenses. The defendant countered by asserting that the law does not allow a party to submit rebuttal testimony where the opposing party has not presented any evidence in its case-in-chief because there is no case to rebut, irrespective of whether evidence concerning the defendant's special defenses was proffered by the defendant during the plaintiff's case-in-chief.

The court noted that the defendant offered evidence during its extensive cross-examination of the plaintiff's sole witness, and the defendant also "proffered some documents in evidence." The court also indicated that the defendant did not have to put forth any evidence in its direct case in order to sustain its burden of proof on the special defenses because the defendant could sustain its burden by the evidence the plaintiff put before the court. While primarily resting its reasoning on the findings in *State* v. *Lisella*, supra, 187 Conn. 335, the court asserted that the threshold question is whether the plaintiff's proffered evidence "could have been introduced at an earlier stage in the proceedings." The court allowed the plaintiff's rebuttal evidence on the basis of its discretion as provided under Practice Book § 15-5 and also because it had denied the plaintiff the opportunity to present evidence to rebut the defendant's special defenses during the plaintiff's case-in-chief.[17] Before allowing the plaintiff to put forth the evidence, the court iterated to the parties that the scope of the plaintiff's rebuttal evidence was limited only to

the defendant's nine special defenses. The plaintiff was not allowed to submit rebuttal evidence in support of its case-in-chief.

"[R]ebuttal evidence is that which refutes the evidence [already] presented . . . rather than that which merely bolsters one's case." (Internal quotation marks omitted.) *Boone* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 335 Conn. 573. "[A] general contradiction of the testimony given by the defendant is considered permissible rebuttal testimony." (Internal quotation marks omitted.) Id., 573–74. The court in *Boone* also cited to 1 K. Broun, McCormick on Evidence (7th Ed. 2013) § 4, p. 16, for the proposition that a plaintiff is "confined to testimony refuting the defense evidence," unless the court, in its discretion, permits a party to "depart from the regular scope of rebuttal." (Internal quotation marks omitted.) Id., 574.

"[T]he policy behind restrictions on the presentation of rebuttal testimony is that a plaintiff is not entitled to a second opportunity to present evidence that should reasonably have been presented in [its] case-in-chief." (Internal quotation marks omitted.) *Cafro* v. *Brophy*, supra, 62 Conn. App. 120. In *Cafro*, we determined that the trial court abused its discretion when it allowed the plaintiffs to call a witness at the last minute after the plaintiffs had rested their case-in-chief and the witness testified about a highly contested issue. Id. The distinction in the present case, however, is that the plaintiff was specifically barred by the trial court from introducing any evidence to rebut the defendant's special defenses during its case-in-chief, even after the defendant submitted evidence concerning the special defenses. The court indicated that it had barred the plaintiff from presenting such evidence because it believed it to be improper to allow the plaintiff to put on a rebuttal case during its case-in-chief where, at the time the plaintiff initially presented the evidence, the issue of the special defenses had not yet been raised.

The defendant's sole contention on appeal related to this issue is that the plaintiff should not be allowed to submit rebuttal evidence because the defendant did not present any evidence or testimony during the defendant's case-in-chief. The record shows that the defendant engaged in a lengthy cross-examination of the plaintiff's sole witness and admitted evidence during the plaintiff's case-in-chief, and, as the defendant conceded at trial, cross-examination is indeed evidence. The plaintiff's rebuttal was not presented to bolster its case-in-chief but, rather, to refute or contradict the evidence the defendant put forth during the defendant's cross-examination of Jonke concerning the defendant's special defenses, and the documents that the defendant admitted during that cross-examination. Thus, the argument advanced by the defendant is untenable.

As our Supreme Court has observed, the trial court

has the sound discretion as to the order of the proceedings. See *Boone* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 335 Conn. 573; see also Practice Book § 15-5. We cannot conclude that the court abused its discretion by allowing the plaintiff's rebuttal evidence after the defendant rested without putting forth any evidence in its case-in-chief where, as here, the defendant pleaded special defenses in its pleadings and, partly, geared its cross-examination of the plaintiff's witness toward addressing those special defenses. Additionally, the court barred the plaintiff from addressing the defendant's special defenses in its case-in-chief. Accordingly, the court did not abuse its discretion in allowing the plaintiff's rebuttal evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See footnote 5 of this opinion.

[2] The Wall Street Theater project was a construction project unrelated to the project at issue.

[3] General Statutes § 49-37 (a) provides in relevant part: "Whenever any mechanic's lien has been placed upon any real estate pursuant to sections 49-33, 49-34 and 49-35, the owner of that real estate, or any person interested in it, may make an application to any judge of the Superior Court that the lien be dissolved upon the substitution of a bond with surety, and the judge shall order reasonable notice to be given to the lienor of the application. . . . Whenever a bond has been substituted for any lien, pursuant to this section, unless an action is brought to recover upon the bond within one year from the date of recording the certificate of lien, the bond shall be void."

[4] On appeal, the defendant does not contest the court's findings as to its sixth, seventh, and ninth special defenses. With respect to the defendant's sixth special defense, which alleged that the plaintiff's claims under the bonds were barred because the owner and Morganti had paid in full for the materials supplied when they paid CSS, the court found for the plaintiff because it was undisputed that the plaintiff had not received any payments from the owner, Morganti, or CSS for the $484,919.30 owed to the plaintiff for the materials it furnished and because General Statutes § 49-36 "only permits such prepayment credit to property owners, not the general contractor."

With respect to the seventh special defense, which alleged that the plaintiff's substitute bond claim was barred because neither the owner, Morganti, nor the defendant owed the plaintiff for the materials supplied, the court found for the plaintiff because the parties had stipulated to the fact that the plaintiff indeed was owed $484,919.30 for materials it supplied that were used for the project.

As to the ninth special defense, the court found that the plaintiff's claims were not barred because the oral agreement between CSS and the plaintiff fell under the "specially manufactured exception" under § 42a-2-201 (3) and, thus, was an enforceable agreement. Further, alternatively, the court found that the delivery tickets and the credit agreement signed by CSS were sufficient to satisfy the requirement for a signed writing.

[5] Although the defendant also claims on appeal that the court erred when it determined that its equitable special defenses did not apply to the surety action at law brought by the plaintiff, we need not address that claim in light of the fact that the court did, in fact, examine the merits of those equitable special defenses and determined, in the alternative, that the defendant had failed to meet its burden of proof as to those special defenses.

Moreover, in its appellate brief, the defendant contests only the court's findings as to whether the plaintiff breached the obligation of "diligence and the utmost good faith" the defendant believed it was owed, and the court's findings as to whether the plaintiff's conduct was "unreasonable" and "reckless." Because the defendant has not challenged the court's finding that the plaintiff was not barred from recovering under the bonds pursuant to the doctrine of unclean hands, we review only the court's finding that the defendant did not sustain its burden of establishing that the plaintiff breached the obligation of "diligence and the utmost good faith."

[6] As noted previously, the defendant also had asserted the same theory in its pretrial brief.

[7] Although the court referenced "unclean hands," we only discuss the court's findings as to bad faith and common-law recklessness. See footnote 5 of this opinion.

[8] General Statutes § 42-158*l* (a) provides: "Any provision in a construction contract or any periodic lien waiver issued pursuant to a construction contract that purports to waive or release the right of a contractor, subcontractor or supplier engaged to perform services, perform labor or furnish materials under the construction contract to (1) claim a mechanic's lien, or (2) make a claim against a payment bond, for services, labor or materials which have not yet been performed and paid for shall be void and of no effect."

[9] The defendant must establish that a contract existed between it and the plaintiff, and that the plaintiff acted in bad faith in carrying out its obligations under the contract in order to sustain a claim that the plaintiff acted in bad faith amounting to a breach of the implied covenant of good faith and fair dealing. As the court found, "[a]ll material suppliers had the right to make a claim upon the payment bond simply by meeting the terms of § 16.1 [of the payment bond]. No other conditions were set forth in the payment bond for any material supplier to make a claim that they had not been paid for materials furnished to them to this construction project. The payment bond did not require any material supplier to perform credit checks on the subcontractor who hired them. The payment bond makes no mention of [the plaintiff] by name. [The plaintiff] did not sign, guarantee or otherwise participate in a modification or amendment of the payment bond. . . . When CSS proposed in September, 2016, to charge [the plaintiff's] materials to CSS' account, [Morganti] did not object nor did it or the defendant offer certain protective tools to verify that CSS would in fact pay [the plaintiff] in full and timely."

[10] The defendant does not contest the court's interpretation of the payment bond's provisions on appeal.

[11] Section 16.1 of the payment bond provides that a valid claim must include a written statement by the claimant and include, at minimum, (1) "the name of the claimant"; (2) "the name of the person for whom the labor was done, or materials or equipment furnished"; (3) "a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the [c]onstruction [c]ontract"; (4) "a brief description of the labor, materials or equipment furnished"; (5) "the date on which the [c]laimant last performed labor or last furnished materials or equipment for use in the performance of the [c]onstruction [c]ontract"; (6) "the total amount earned by the [c]laimant for labor, materials or equipment furnished as of the date of the [c]laim"; (7) "the total amount of previous payments received by the [c]laimant"; and (8) "the total amount due and unpaid to the [c]laimant for labor, materials or equipment furnished as of the date of the [c]laim."

[12] On appeal, the defendant challenges only the court's finding that the documents furnished by the plaintiff satisfied item 3 of § 16.1 of the payment bond. The defendant does not contest the court's findings that the plaintiff satisfied items 1, 2, 4, 5, 6, 7, and 8 of § 16.1 of the payment bond.

[13] We note that the plaintiff was not a party to the payment bond agreement or contract but merely a claimant as defined in § 16.2 of the payment bond, which provides in relevant part that a claimant is an "individual or entity having a direct contract with the [c]ontractor or with a subcontractor of the [c]ontractor to furnish labor, materials or equipment for use in the performance of the [c]onstruction [c]ontract. The term [c]laimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien . . . ."

[14] We note that the defendant is not contesting the court's decision as to the amount awarded under count two of the complaint, in which the plaintiff sought relief under the payment bond that had a penal sum of approximately $53 million.

[15] We note that "a judgment on the merits is final for purposes of appeal even though the recoverability or amount of attorney's fees for the litigation remains to be determined." (Internal quotation marks omitted.) *Doyle Group* v. *Alaskans for Cuddy*, 164 Conn. App. 209, 218, 137 A.3d 809, cert. denied, 321 Conn. 924, 138 A.3d 284 (2016). Moreover, "[w]hether the claim for attorney's fees is based on statute, a contract, or both, the pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal." (Internal quotation marks omitted.) Id., 220.

[16] We do not consider whether the defendant was required to file a motion to reargue in order to preserve this claim. The defendant's claim, however, is waived because it failed to file or raise any objections at trial regarding the court's award.

[17] Practice Book § 15-5 (a) provides in relevant part: "Unless the judicial authority for cause permits otherwise, the parties shall proceed with the trial and argument in the following order:

"(1) The plaintiff shall present a case-in-chief.

"(2) The defendant may present a case-in-chief.

"(3) The plaintiff and the defendant may present rebuttal evidence in successive rebuttals, as required. The judicial authority for cause may permit a party to present evidence not of a rebuttal nature, and if the plaintiff is permitted to present further evidence in chief, the defendant may respond with further evidence in chief. . . ."

---